own business practices, and the admissions of H&R Block's own corporate managers. From the perspective of the class representatives, they testified that they considered themselves to be in a continuing employment relationship. They explained that everything was geared towards that you were still an employee and continuing with your tax preparation business at H&R Block. They also confirmed that H&R Block's reliance on its rehire process was elevating form over substance. H&R Block's own business practices and other admissions corroborated the class representative's testimony. Outside of the litigation context, H&R Block describes its end-of-tax-season off-boarding process as a tax professional's quote, first step in next year's on-boarding and quote, transition to next year. H&R Block also defines within its business practice documents what a gap in employment is for tax professionals. A gap in employment occurs only if that tax professional doesn't continue to work from one season to the next. H&R Block's claim in the litigation that it formally terminates the employment of its tax professionals at the end of the tax season is inconsistent with H&R Block's own internal documentation outside of the litigation context and its own manager's admissions. Were your clients eligible for unemployment compensation? Yes. There is evidence in the record that tax professionals were provided by H&R Block documentation to encourage them to apply for unemployment during the off-season. While that fact may be relevant, it's not dispositive because we're dealing with the FLSA and the requirement that we consider the totality of the circumstances, the economic reality of the circumstances present using kind of a practical approach based on the unique facts. So while they may be eligible to apply for unemployment in certain states, that fact in and of itself would not be dispositive, merely one of many relevant facts. Well, not all of the employees were hired, were they? Not all of them were rehired? That's true, Your Honor. Not all tax professionals who completed one season were rehired in H&R Block's terminology in the next season. But what the data shows is that 93% of those who followed H&R Block's form over substance procedure submitting an application for rehire, one that would be pre-populated by H&R Block to facilitate it simply being turned back in, 93% of them did continue to work in the next season. What do we know about the 7%? It's not necessarily that H&R Block chose not to hire them. That 7% includes the people who didn't complete the 24 hours of mandatory training. We know from the record the district court summary judgment order specified class representative Carla Collins didn't continue to work after her third season, but the reason was she didn't complete her 24 hours of training. Do you agree that it's a balance of benefits test? I think it depends, Your Honor. If this disputed issue of fact at the threshold, this idea are we dealing with continuing employment or are we dealing with a termination and rehire, the resolution of that disputed issue of fact moves us into two alternative theories. One analysis would focus on the Department of Labor's regulations that specifically govern training time and similar activities done by employees. On the other hand, if the disputed issue of fact were to be resolved by a jury in favor of H&R Block that this is a situation of termination and rehire, we would be dealing with what is commonly referred to as the balance of the benefits test, where we look to see who the primary beneficiary of the training is. So I think it depends. If we are looking at an analysis that looks at the primary beneficiary, and again, I think it's a valid area to be inquiring in the totality of the circumstances here because we know that the ordinary definition of employment does include as an element whether the activity is pursued primarily and necessarily for the benefit of the employer and his business. Here, there was extensive evidence by plaintiffs that H&R Block and its business are the primary beneficiary. So if we're looking under a framework that considers that as a valid consideration among others, there's extensive evidence that H&R Block is in fact the primary beneficiary here, and the district court improperly resolved that fact issue in H&R Block's favor. The evidence on who the primary beneficiary of was extensive. Plaintiffs came forward with evidence that there was no federal regulation or requirement that tax professionals complete any continuing education or training. H&R Block's 24-hour requirement is specific to continued employment with this company, and that's an important point. The Second Circuit in Kazakow v. New Rochelle Radiology, cited in our papers, drew the distinction between training on the one hand required by a governmental agency for certification or licensure and training required by an employer. And the point is when the training is required by the employer, it is one, according to the Second Circuit, not voluntary, but two, it also illustrates that in that context it is likely that the employer is the primary beneficiary of it. They're the ones requiring it. It's not required by a governmental agency. We also know from the record that H&R Block's training courses feature H&R Block's own internal systems and proprietary software. While that fact in and of itself may not be dispositive, it's certainly relevant in part of the totality of circumstances being considered under the primary beneficiary test. There's also substantial economic advantages and benefits to H&R Block from having its folks complete these 24 hours of unpaid training. We pointed in the record to an internal email by one of H&R Block's own executives. When asked whether H&R Block paid for this training, paid a wage for its tax professionals to complete this training, the response was an internal email boasting, quote, we don't pay. In fact, they pay us. That document, that internal email by an executive of H&R Block, is evidence from which a reasonable fact finder could conclude that H&R Block is enjoying benefits and advantages from this training. H&R Block is also promoting the completion of these 24 hours of training as a competitive advantage. While not the primary purpose of the FLSA, this court has recognized that a secondary purpose is the protection of competition. Here we have one of the major providers of tax preparation services in the country. Identifying a competitive advantage over its others, Jackson Hewitt, Liberty Tax, because H&R Block's tax professionals are completing this training and the others are not. Can I go back to your continuing employment theory? The cases you cited, at least as best I could tell, were all NLRA cases or Warnak cases. I didn't see any that were FLSA cases. Are there any? There are not, Your Honor. There has not been a case yet to address. the scope of the FLSA's coverage, the employment relationship coverage in the context of seasonal employment or a continuing employment relationship. That issue has simply not arisen. It has, though, arisen in two cases, one by the U.S. Supreme Court and one by the Fourth Circuit under the NLRA. If you have coverage under the NLRA, the Supreme Court and this court just several months ago has held that if you have coverage under the NLRA, that's persuasive in identifying similar coverage under the FLSA because those statutes were enacted as part of the same social set of statutory regulation. And I think those cases are persuasive. It's not that we're asking this court to adopt interpretations under the NLRA, but those cases illustrate the concept that continuing employment is something that should be recognized. Well, let me ask you, under your theory, if an employee worked a tax season year one, took the courses in between year one and year two, didn't work year two, they'd be entitled to be paid for that. Yes. The later decision, either by H&R Block, perhaps in that example, or by the employee not to continue in the next season can't change or recharacterize the training at the time it's taken. There may be any number of instances when an employer provides its employees training that they're paying for and the employee in an at-will employment context may turn around and leave at the conclusion of the training. That's just a reality of the at-will employment relationship. Was this at-will or contractual? Well, there's a written employment agreement, but it's terminable at-will. All it requires is seven days' notice. So they are, in effect, in an at-will employment environment. They are very close to it. Your Honors, I see I'm into my rebuttal time. I'd like to reserve that at this point. Thank you. You may do so. I hear from the appellee. Mr. Carr, good morning. You may proceed. I take it Mr. Arnold will not be arguing? He will not be. Those of us who know him know it's hard for him to remain silent, but we'll bear up as well as we can. Let's see how he does. Good morning. May it please the Court. Donovan v. Trans World Airlines established this Court's controlling test for the compensability of training time. One, no immediate economic benefit. Two, no displacement of regular workers. Three, the training at issue teaches fungible and transferable skills. And, in addition, the Donovan Court used the Department of Labor's six-factor test to support the ultimate result. There is absolutely no need to adopt a new test in this circumstance. Does it make any difference, though, in those cases that the people hadn't, the trainees hadn't worked for the company before? In this case, they do. Not from a legal perspective. What Donovan did was use an analytical framework to determine circumstances in which training could create an employment relationship. So, in the Donovan v. Trans World Airlines case, it was flight attendants who were going through pre-employment training, and the question was, did the training and the circumstances that I just laid out create an employment relationship? The Court said no. In this particular case, all the plaintiffs are seeking or, pardon me, all the appellants are seeking compensation for is training during this eight-month window of time. And under those circumstances, the appropriate test to utilize is a test to determine whether or not that training creates an employment relationship. There's nothing else at issue. And if you apply the Donovan test to the facts of this particular case, you reach the conclusion, just as this Court did in Donovan, that that training time would not be compensable. The undisputed facts in this case tell the story. Well, I think they want to argue that the employment didn't end. So it isn't really a question of, does the training create employment? It's a question of whether they continue to be employed, or at least whether there's a fact question on that. Well, I think there is no question that is what they are intending to argue. As you appropriately noted, Judge Grunder, it does raise, as an initial matter, just some practical implications just in terms of applying that type of doctrine. In our brief, we cited the example of imagine a place four months after the conclusion of a tax season and four months before the beginning of the next. Who are H&R Block's employees at that time? Is it people who've taken some training and decided in their own mind they're never going to come back to H&R Block? Is it people who in their own mind have decided they're coming back but haven't taken training? Is it people who've only taken all of the 24 hours of the training? It is an absolutely impossible concept to get your hands around. It makes sense in the context of the NLRA, where you might want to protect organizational rights over some continuing span of a break in employment. But in the context of the FLSA, where you're talking about compensation for work performed, it doesn't make any sense. And as a factual matter, it doesn't make any sense here. And I'm just talking about the undisputed facts that are in the record below. At the end of every tax season, the express written contracts expire. The tax professionals receive their final paychecks. They have a separation meeting where they're given separation documents. How long is H&R Block using that type of contract? The employment contract? Well, there's exemplars in the record all the way through the limitations period here. They are unable to and frequently do collect unemployment. In fact, some 47,000 of them have done so since 2007. They are able to and frequently do work for other companies during the off-season. They do not prepare tax returns for customers or meet with any clients during the off-season. If they want to come back, they need to apply just like anyone else applies for a job. They turn in a new application. They fill out an I-9 in accordance with legal requirements. They go through an employment interview. They fill out new hire paperwork. And even in that circumstance, over 20,000 of these individuals who actually applied for employment were not hired in the last five years. Those who were selected do receive a welcome letter welcoming them to the H&R Block family and offering them a seasonal position. But H&R Block only hires tax preparers whose skills in education and tax law are current, just like many employers require some educational prerequisite to come work for them. And thus, they require 24 hours of CPE to be taken during the off-season to be eligible to be rehired. They can take this CPE at any time they want during the eight-month off-season. They can take the CPE from an outside provider, such as a college or other institution, or through classes and online instruction offered by H&R Block, 80 percent of which is simply purchased by H&R Block through CCH, an outside provider, and has absolutely no H&R Block content whatsoever. H&R Block CPE is certified and approved by the Internal Revenue Service, the Enrolled Agents Associations, the National Association of State Boards of Accounting and Individual States, including satisfying state-mandated tax preparer continuing education requirements. H&R Block, and I think this is an important point, does conduct training that is specific to H&R Block. It does so after these folks are hired and come to work. It's called Skills to Win, and it's entirely paid training, which is different than CPE. This educational requirement to be rehired does not make tax professionals, employees, in the event that at some point during this eight-month off-season, while they're doing other jobs, collecting unemployment, or doing whatever they like, they decide to update their tax education by taking CPE. CPE is truly akin to any other type of educational requirement. Now, if you apply to- What's your response, though, to the argument that it's solely for the benefit of H&R Block? Well, I think the answer to that is, number one, there's a couple ways to look at this. The test relates to immediate economic benefit. It's a test that derives, contained in the Donovan case, derived from Walling v. Portland Terminal. And what is at issue is not whether or not there is some hypothetical benefit that could flow to H&R Block in the future. The question is whether or not there's an immediate economic benefit. So in Donovan, in Walling, the courts were looking at whether or not productive work was actually being performed by these employees, as opposed to some form of initial training. In the Donovan court, specifically noted that no employer would ever do training if it wasn't going to get some kind of benefit out of it, other than just as a matter of pure pro bono. So you don't look at whether or not there could ultimately flow a benefit. Rather, you look at whether or not, in this particular circumstance, productive work is being performed. And there is no dispute that no productive work is being performed during the conduct of CPE. And the $20 fee is de minimis? As the district court noted, the $20 fee is, as a practical matter, something to offset the cost of H&R Block purchasing and providing all of the CPE, which the former tax professionals can take as much as they want for $20. It is also not the type of immediate economic benefit that courts were talking about, no more than college tuition is an immediate economic benefit. The immediate economic benefit is, again, productive work being performed by trainees in this particular circumstance. So applying the Donovan test, which is the governing test here, number one, no immediate economic benefit for the reasons that we just assessed, Judge Grunder. Two, no regular employees can be replaced. Absolutely the case. Totally undisputed here. And three, the training at issue is fungible and transferable. I think an important point to note in connection with that is that the training can be taken at Block or any other institution approved by others. Most of the training, again, is created by outside providers and not specific to H&R Block. The very limited, and the record is clear, the very limited number of courses that are taught live by H&R Block instructors use, at times, H&R Block's tax preparation system to illustrate examples in terms of how to prepare particular tax documents. That's the extent of it. It's just used, I mean, everything in terms of preparing taxes these days is electronic, and so you have to use some system, and that's the one they have available to them. Now, the Donovan Court looked to the Department of Labor's six-factor test to reinforce or confirm its result, and similar to Donovan in this case, you would reach the same result as well. The test is similar to a vocational school for the benefit of the trainees, does not displace regular workers, no immediate advantage, and not entitled to a job at the end, and the individuals understand they won't be paid. Now, you asked a question earlier about the continuing employment doctrine, and I think it's worth addressing. To be clear, no court ever has implied an employment relationship in the context of the Fair Labor Standards Act, ever. And it is extremely clear why. While it might make sense to protect organizational rights or notice rights or other things in connection with employees who have a break in employment, it certainly does not give them a right to compensation while they're off collecting unemployment or making a decision about whether or not they ever want to return at all. The cases that have applied this continuing employment theory were extremely fact-specific. NLRB v. Waterman, which even the Supreme Court noted, was a rare case in which the court was making a factual determination and reviewing a case for factual error, and it involved a circumstance where the ships were at port. There was a break of between seven and 27 days. There were statutorily required articles that sailors would sign off on. The ship comes into port. Everyone who's affiliated with a particular union is fired. They come back, and the Supreme Court and the National Labor Relations Board are faced with the question of should these people have retained some sort of pseudo-employment status during that window of time. That makes sense. In the FLSA context, it certainly doesn't. Notably, Justice Black in the U.S. Supreme Court wrote both Waterman and Portland Terminal. Justice Black was the sponsor of the FLSA during a time that he was actually a senator in the United States Senate. And during the period of time between the decision in Waterman and Portland Terminal, there were 38 cases decided by the United States Supreme Court dealing with the FLSA. Not a single one of them cited Waterman, and not a single U.S. Supreme Court case since has cited Waterman in the context of the FLSA. Going a step further, again, no court has ever cited Waterman in connection with the FLSA. I did want to raise one additional point. Appellants refer to this court's recent case in Lucas v. Jerusalem Cafe. And in that instance, the issue was whether or not aliens were entitled to the protections of the FLSA. And the appellants have argued both in their briefing and before this court that in that case, this court said you can borrow these concepts from the FLSA and NLRA and use them interchangeably to the extent it makes sense. That is not what Lucas v. Jerusalem said. What Lucas v. Jerusalem did was, in a very separate argument, where the question was whether or not Hoffman plastic compounds stood for the proposition that the IRCA implicitly amended the FLSA to exclude unauthorized aliens, the court noted that the NLRA contains a broad definition of employee and characterizing its definition as analogous to that in the FLSA. There are a number of cases that draw those kinds of parallels, but there are no cases that have looked to the NLRA to decide the precise question of whether or not someone has employee status under the FLSA. And the court certainly did not go so far as to do so here. But even if you were to apply a continuing employment theory to this case, the individuals who were formerly employed by H&R Block were not employees during the off-season. There was no customary continuation of employment. Again, the record reflects 93 percent of the individuals who sought to be rehired were rehired, 7 percent, thousands were not. The record also reflects that only 75 percent of the people who leave in a given tax year come back the next. So we are talking about thousands of people who don't return in any given year. And when these cases like Waterman and Labor Ready deal with the question of customary continuation of employment, they're dealing with circumstances where there's every expectation you're going to have a job. A seven-day break on a shore leave, that's Waterman. Labor Ready was overnight gaps of employment where literally 16 hours later, the person was coming back to work and the question was whether or not they remained an employee during that 16-hour period. The fact that H&R Block engaged in other activities and recruiting activities and the like is irrelevant. Appellants have cited to a number of facts that they claim are material disputed issues of fact. None of them are material. If you assume every single thing that appellants have said is accurate here, summary judgment is still warranted because none of the things that they're talking about have anything to do with the performance of productive work and people acting as employees. None of them do. Comments by executives, recruiting activities where H&R Block is trying to bring these people back and rehire them, which it certainly did, have nothing to do with whether or not productive work was being employed or productive work was being done. In sum, the Donovan versus Transworld Airlines test is the eight-circuit test dealing with the compensability of training time in this context. It can be applied very easily here, and if you apply it, you reach the conclusion that this training time is not compensable. Thank you. Mr. McGuire. To begin, Your Honors, Donovan versus Transworld Airlines is not a summary judgment case. It was an appeal from a bench trial, and the findings of fact and conclusions of law were entered by the magistrate judge who sat by designation in a bench trial. It is not a summary judgment case. The difference here is we have disputed issues of fact. Just because there is an ultimate legal determination as to employee status does not permit a district court to weigh facts, credibility, and make determinations as the court did here. Could you list what you think are the key disputed issues of fact? Your Honor, I think there are two fundamental disputed issues of fact that predominate in this case. The first is whether H&R Block's relationship with tax professionals is one of continuation and rehire or continuing employment. That is a disputed issue of fact. Plaintiffs have come forward with evidence that they are treated like permanent seasonal employees. Permanent seasonal employees, if H&R Block chooses to treat its employees like that, they need not just to accept the benefits of that but also the obligations under the FLSA to pay for compensable activities. The other predominating disputed issue of fact is who is the primary beneficiary of this training. Is it H&R Block and its business, or is it the tax professionals? As we've laid out in our briefs, plaintiffs came forward with substantial evidence that H&R Block is the primary beneficiary here. And one of the components of the primary beneficiary test that illustrates that most clearly is whether this training is, in fact, and to a large part, fungible and transferable. We've come forward with facts showing that it is not. This case is very different and unique from all others because H&R Block tells its tax professionals about this training only after they've been hired and signed written employment agreements. These written employment agreements include what is, in effect, a two-year non-compete. We've cited testimony in the record that tax preparation is a book of business industry. These written employment agreements that these folks are required to sign when they begin their employment include a limitation on their ability to serve any client that they served at H&R Block for a period of two years. So if someone takes training during a particular summer, chooses not to come back, it will be three years later before they can service their book of business. Again, this is a book of business industry. Once we get three years later, how valuable is this tax training? H&R Block itself does not permit any carry-forward hours beyond the year in which it's taken. This is their handbook at page 0052 of the summary judgment exhibits. I mean, if H&R Block itself doesn't permit any carry-forward hours, it illustrates that the value is its immediacy. So it is not fungible and transferable. These folks cannot take this training and go use it elsewhere with a competing provider, and that makes this case very different. So, Your Honor, in answer to your question, those are the two primarily and predominating disputed issues of fact. Are we in a continuing employment relationship where H&R Block is treating folks like permanent seasonal employees, or is this fiction of termination and rehire, elevating form over substance, going to control? The second is who really is the primary beneficiary of the training, and it relates to the question of whether H&R Block's training is actually fungible and transferable. There are disputed issues of fact here. We ask this court to reverse the decision of the district court and remand this case for a jury trial on plaintiff's claims. Thank you. Very well. The case has been well-briefed and well-argued on both sides. It's now under submission, and we will take it under consideration. Thank you, Your Honor.